UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANNE MARNOCHA,　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　)　　No. 1:18-cv-02714-JRS-MPB
　　　　　　　　　　　　　　　　)
ST. VINCENT HOSPITAL AND HEALTH　)
CARE CENTER, INC. AND ST. VINCENT　)
CARMEL HOSPITAL, INC.,　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　)

## Order on Defendants' Motion for Summary Judgment (ECF No. 45)

Plaintiff Anne Marnocha brings claims against Defendants St. Vincent Hospital and Health Care Center, Inc. and St. Vincent Carmel Hospital, Inc. for discriminatory termination and failure to hire.  (Compl., ECF No. 1.)  Specifically, Marnocha alleges that Defendants discriminated against her on the basis of her age by terminating her neonatologist position at St. Vincent Carmel Hospital, Inc. and not hiring her for an open neonatologist position at St. Vincent Hospital and Health Care Center, Inc.  Defendants now move for summary judgment.  (ECF No. 45.)  For the following reasons, Defendants' Motion for Summary Judgment is **granted**.

Further, Defendants' Motion to Strike Surreply (ECF No. 59) is **denied**.[1]  The Court has considered Marnocha's Surreply (ECF No. 56) in deciding Defendants' Motion for Summary Judgment.

---

[1] Defendants moved to strike Marnocha's Surreply on the grounds that she did not seek leave of Court before filing and she did not identify any new arguments or evidence cited in De-

# I. Background

Neonatal Intensive Care Units ("NICUs") have four levels of care based on the services that the units can offer. (Marnocha Dep. 39:3-8, ECF No. 47-6.) Level IV NICUs are the highest units that the State of Indiana certifies, and they treat the sickest babies. (*Id.*) St. Vincent Hospital and Health Care Center on 86th Street ("86th Street") currently operates a Level IV NICU and St. Vincent Carmel Hospital ("Carmel") currently operates a Level III NICU. (Rothenburg Dep. 60:14-16, ECF No. 47-8; Marnocha Dep. 43:2-9, ECF No. 47-6.) The main distinction between levels III and IV is that level IV NICUs can handle babies that are on Extracorporeal Membrane Oxygenation and babies who need cardiovascular surgery. (Marnocha Dep. 42:20-24, ECF No. 47-6.)

Dr. Anne Marnocha began working as a neonatologist at 86th Street in 1987 to help develop the NICU into a Level III facility. (*Id.* at 32:23—33:5; *Id.* at 29:22—30:9.) At some point between 1987 and 2003, 86th Street became a Level IV facility. (*Id.* at 43:15—44:3.) In 2003, Marnocha transferred to Carmel to run the new perinatal service program. (*Id.* at 33:9-25.) At the time, Carmel was building a perinatal service program, with the goal of establishing a Level II NICU and eventually advancing to a Level III NICU. (*Id.* at 33:15-21.) Marnocha was the Medical Director at Carmel from 2003 to 2018. (*Id.* at 34:1-6.) Carmel became a Level III facility in 2005. (*Id.* at 43:2-9.)

---

fendants' Reply (ECF No. 52). Neither the local rules nor this Court's Practices and Procedures require parties to seek leave before filing a Surreply, and Marnocha's Surreply is limited to responding to new evidence cited in Defendants' Reply. Therefore, Marnocha did not need to seek leave of this Court before filing her Surreply.

In June of 2017, Dr. Hossain Marandi, Executive Director of the pediatric service line for all St. Vincent hospitals in Indiana, began analyzing the operations of the 86th Street and Carmel NICUs. (Marandi Dep. 12:15-20; 14:22—15:8, ECF No. 47-5.) Marandi determined that the neonatologists at 86th Street were not working at full capacity, and that, statewide, St. Vincent had too many neonatologists. (Marandi Dep. 11:14-22, ECF No. 47-5.) Carmel had five full-time neonatologists at the time: Dr. Marnocha (age 62), Dr. Catherine Watts (Age 58), Dr. Nancy Lemear (age 53), Dr. Kem Templeton (age 59), and Dr. Melissa Landis (age 35). (Restructure of Operations Guideline, ECF No. 51-7 at 5.) 86th Street had twenty-two neonatologists and ten newborn hospitalists. (*Id.* at 7-8.) Sixteen of those doctors had been at 86th Street for less than five years. (Harris Dep. 95:5-15, ECF No. 51-10). Thirteen of the twenty-two neonatologists were above the age of 40, and three were older than Marnocha. (Restructure of Operations Guideline, ECF No. 51-7 at 7; Aldrich Decl. ¶6.)

In August 2017, Marandi met with a small group comprising Dr. Melissa Leedy, neonatologist at 86th Street; Dr. Taha Ben Saad, Neonatology Medical Director at 86th Street; Stacey Yeo, nurse practitioner at 86th Street; Dr. Ina Whitman, neonatologist at 86th Street; Dr. Kevin Stutey, neonatologist at 86th Street; Dr. Jen Havener, neonatologist at 86th Street; and Dr. John Wareham, neonatologist at 86th Street to discuss the overstaffing issue. (Leedy Dep. 20:15—21:5, ECF No. 51-8.) However, Marandi denied that he consulted with this group and testified that he made the decision on his own, and that as of November 30, 2017, only Ben Saad and

Sandy Aldrich, Director of Physician Practice Operations, knew that he was looking into the operations of the NICUs. (Marandi Dep. 29:13-17 20:17-25, ECF No. 47-5.)

Whitman testified that he and the others in the small group "felt that they did not have too many neonatologists." (Whitman Dep. 55:11-13, ECF No. 47-9.) Yeo, Whitman, and Leedy also testified that the 86th Street doctors were working at full capacity. (Yeo Dep. 19:16-22, ECF No. 51-9; Whitman Dep. 12:25, ECF No. 47-9 Leedy Dep. 13:18—14:5; ECF No. 51-8.) But Leedy also testified that it was "a matter of opinion" whether the 86th Street neonatologists were working at full capacity, because the administration had told them that hours that counted towards their Full Time Equivalent (FTE) no longer counted. (Leedy Dep. 21:4—22:7, ECF No. 51-8.)

On September 12, 2017, Marandi presented his findings to the President's Council of St. Vincent and recommended a corporate restructure that would consolidate the 86th Street and Carmel NICUs. (Marandi Dep. 15:4-8; 22:4-7, ECF No. 47-5.) The purpose of the restructure was to improve both NICUs by standardizing care between the hospitals, increasing efficiency, and improving cost effectiveness. (Marandi Dep. 12:10-14; 17:3-10; 20:20-22, ECF No. 47-5.) Marandi recommended that all five of the Carmel neonatologists, including Marnocha, be terminated. (Marandi Dep. 17:17-25, ECF No. 47-5.) 86th Street would hire one new neonatologist and the 86th Street neonatologists would staff the NICUs at both 86th Street and Carmel. (Marandi Dep. 22:20—23:5, ECF No. 47-5.)

Marandi recommended terminating the Carmel neonatologists because they worked at a Level III NICU and would not necessarily be able to properly care for the

babies at the Level IV NICU at 86th Street. (Marandi Dep. 22:20—24:6, ECF No. 47-5.) Marandi "reviewed [the] current workflow and [the] schedule" of the 86th Street neonatologists and "assumed that they would be able to provide the coverage . . . needed at Carmel." (Marandi Dep. 19:9-11, ECF No. 19.) Marandi was not aware if the Carmel neonatologists had Level IV experience and he did not look into it. (Marandi Dep. 24:11-15, ECF No. 24.)

On September 25, 2017, Human Resources Director Ross Brodhead sent Human Resources Partner Kellie Harris an e-mail asking her if she could "run point" on a plan that would involve several neonatologists being "reduced." (HR E-mails, ECF No. 51-11.) Whenever there is a corporate restructure, Human Resources creates a restructure analysis, called a "Restructure of Operations Selection/De-Selection Process Guideline," to analyze whether there is any legal risk. (Harris Dep. 76:25—78:4, ECF No. 51-10.) In October 2017, Harris and Marandi discussed the restructuring plan. (Harris Dep. 41:5—42:7, ECF No. 51-10.) Harris testified that she and Marandi discussed moving Landis to 86th Street. (*Id.* at 41:7-9.) Marandi does not recall having that conversation. (Marandi Dep. 34:1-11; ECF No. 51-3.) Harris claims that the interest in moving Landis to 86th Street was because of her recent Level IV experience, (Harris Dep. 42:3-7; 55:2-11, ECF No. 51-10), but Marandi stated that he did not look into, nor did he know, the Level IV experience of the Carmel neonatologists (Marandi Dep. 24:11-15; 27:12-15; 58:3-17, ECF No. 51-3.).

While preparing the Restructure of Operations analysis, Harris sent Brodhead an e-mail that read: "The highlighted green group is the target group, right?" (HR E-

mails, ECF No. 51-11.) The e-mail contained a list of nine neonatologists, but in the reproduced version, the green highlight is not visible. Harris testified that without the color, she could not tell which doctors she was referring to, but the list did contain four of the five terminated Carmel neonatologists. (Harris Dep. 27:23—28:4, ECF No. 51-10.) In her final draft of the Restructure of Operations, Harris included the five Carmel neonatologists, twenty-two 86th Street neonatologists, and ten newborn hospitalists as the "target group." (*Id.* at 52:20—53:2.) The "target group" for the restructure plan was "everyone with the same responsibilities in the departments that [were] looked at." (*Id.* at 52:25—53:2.) Although there was never any discussion to terminate the doctors at 86th Street, Harris was considering all of the neonatologists as part of the target group "from an HR standpoint." (*Id.* at 53:3-9.) Harris explained that even though a leader may come to her and say, "I want to do X, Y, Z, . . . HR's role is to look at everyone that is included in that targeted group as one whole department." (*Id.* at 79:18-25.)

Sometime before December 2017, Marandi met with the 86th Street doctors and told the group that they were not meeting their FTE and that their schedule would have to be adjusted in order for the doctors to meet their requirements. (Marandi Dep. 60:9-16, ECF No. 47-5.) Marandi did not tell this group that the Carmel neonatologists would be terminated and that the 86th Street neonatologists would be covering the Carmel NICU. (*Id.* at 60:20—61:10.)

On January 5, 2018, Marandi, Gary Fammartino, then President of Carmel, and Kellie Harris, Human Resources Partner, met with Marnocha and informed her of

her termination. (Marnocha Dep. 67:3-10, ECF No. 47-6; Marandi Dep. 89:23—90:4, ECF no. 47-5.) Marandi told Marnocha that there was an open neonatologist position at 86th Street, and that she and the other terminated Carmel doctors were welcome to apply. (Marnocha Dep. 69:14-20, ECF No. 47-6.) Marandi also informed Marnocha that he was getting a panel together to interview candidates for the open position and asked her if she would like to have any input. (*Id.* at 70:3-9.) Marnocha expressed concern about having a fair panel and told Marandi she did not think Dr. John Wareham would be a fair panelist. (*Id.* at 70:6-11.) Marnocha recommended Dr. Ina Whitman to be on the panel. (*Id.* at 70:11-14.) Marandi asked Marnocha about Dr. Melissa Leedy, and Marnocha said she didn't know much about her and that she was one of the youngest in the group. (*Id.* at 70:15-18.)

The panel was comprised of: Dr. Ben Saad, Neonatology Medical Director at 86th Street; Dr. Amy Moon-Holland, OBGYN affiliated with Carmel, Dr. Melissa Leedy, neonatologist at 86th Street; Dr. Jeffrey Rothenburg, Chief Medical Officer at 86th Street; Dr. Ina Whitman, neonatologist at 86th Street; and Stacey Yeo, neonatal Nurse Practitioner at 86th Street. (*Id.* at 99:20—100:12.) Four of the five Carmel neonatologists who were terminated interviewed for the position. Dr. Marnocha (age 62), Dr. Watts (Age 58), Dr. Templeton (age 59), and Dr. Landis (age 35). (*Id.* at 96:1-9.) After each interview, the panel discussed the candidate and filled out interview forms with eight categories, including: Educational Background, Prior Work Experience, Technical Qualifications, Verbal Communication, Enthusiasm, Knowledge of

Company, Team Building/Interpersonal, and Initiative. (Leedy Dep. 66:16—67:1, ECF No. 51-8; Rothenburg Dep. 43:21—44:17, ECF No. 51-4.)

On the interview form Rothenburg filled out for Marnocha, he wrote: "end of her career." (Rothenburg Dep. 49:5-6, ECF No. 51-4.) Rothenburg explained, "as an administrator I want to build for 20, 30 years in the future, not just for the next five years," (*id*. at 49:12-14), and "I would be remiss if I didn't take both immediate needs as well as future needs into account when hiring anybody" (*id*. at 52:10-13).

The panel unanimously chose to hire Landis for the position. (*Id*. at 31:21-23; Ben Saad Dep. 30:13-23, ECF No. 47-2.) They chose Landis, in part, because of her recent Level IV NICU experience, which she obtained five years prior at Cincinnati Children's Hospital Medical Center, one of the highest ranked NICUs in the nation. (Ben Saad Dep. 36:21—37:1, ECF No. 47-2; Rothenburg Dep. 57:10—58:2, ECF No. 47-8; Whitman Dep. 33:5—35:7, ECF No. 47-9.) The panel also considered Landis' overall positive attitude about the position, her well-articulated plan for how she would transition to working in a Level IV NICU, and the fact that she had already begun researching surgical protocols and ventilation procedures used in Level IV NICUs. (Leedy Dep. 41:4-13, ECF No. 47-4; Whitman Dep. 32:15-25, ECF No. 47-9.)

The panel felt Marnocha was unable to communicate how she would transition into a Level IV NICU. (Whitman Dep. 43:15—44:18, ECF No. 47-9; Moon Dep. 54:15—55:4, ECF No. 47-7.) Because Marnocha had worked in a Level IV facility fifteen years prior, she did not believe she would require much extra training, as not much had changed. (Moon Dep. 54:15-19, ECF No. 47-7; Whitman Dep. 43:5-15, ECF

No. 47-9.)  The panel disagreed and noted that medicine is constantly changing and that they themselves would not feel comfortable jumping into a Level IV NICU if they had not practiced the relevant skills within the past few years.  (Moon Dep. 54:22—55:4, ECF No. 47-7; Whitman 43:19—44:15, ECF No. 47-9; Rothenburg 33:3-11, ECF No. 47-8.)  Additionally, Dr. Whitman explained that although Carmel was a Level III NICU, they did not always have Level III babies, and often times were only caring for Level II babies who were not that ill.  (Whitman Dep. 44:2-10, ECF No. 47-9.)  Carmel also only had approximately six or eight babies on a daily basis, while 86th Street cared for 60 to 70.  (*Id.*)

However, Marnocha disagrees, and believes Level IV care is not as much about training, but about what specific hospitals can provide.  (Marnocha Dep. 68:17—69:5, ECF No. 47-6.)  Marnocha testified that all the Carmel neonatologists were trained in Level IV care and had taken care of extremely ill Level IV babies until they could be transferred to 86th Street.  (*Id.*)

On February 26, 2018, St. Vincent hired Landis to fill the open neonatologist position.  (Aldrich Decl. ¶8, ECF No. 47-1.)

Before Marandi developed his restructuring plan, on April 17, 2017, 86th Street hired Dr. Hilary White (age 37) to fill an open neonatologist position.  (Marandi Dep. 87:19—88:5.)  She began working at 86th Street on August 28, 2017, three months after Marandi had determined that there were too many doctors at the 86th Street NICU.  (Marandi Dep. 52: 20-24, ECF No. 52.)  After the restructuring took effect, on August 13, 2018, Dr. Kelsey Montgomery (age 36) joined the 86th Street NICU.  (Ben

Saad Dep. 61:15-18, ECF No. 47-2.)  St. Vincent signed a contract with Montgomery in 2016, when she was a pediatric resident, offering her employment as a neonatologist when she completed her neonatology fellowship.  (Aldrich Decl.  ¶¶9-11, ECF No. 47-1.)

## II.    Legal Standard

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party," *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017), but the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In this employment discrimination case, Marnocha bears the "substantive evidentiary burden," *Anderson*, 477 U.S. at 254, of proving by preponderance of the evidence a prima facie case of discrimination, *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981).  Thus, summary judgment for Defendants is warranted if, viewed in the light most favorable to Marnocha, "the record as a whole could not lead a rational trier of fact" to find that Marnocha's age caused Defendants to terminate or fail

to hire Marnocha. *See Matsushita*, 475 U.S. at 587; *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017).

## III. Discussion

In considering a motion for summary judgment in an employment discrimination case, district courts should not sort evidence "into different piles, labeled 'direct' and 'indirect', that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). *Ortiz* abrogated the distinction between direct proof and indirect proof but did not "displace[ ] the burden-shifting analysis established in *McDonnell Douglas*," which courts had formerly referred to as the "indirect" method of proof. *Ferrill*, 860 F.3d at 499.

Post-*Ortiz*, it's clear that the *McDonnell Douglas* framework is just a "means to consider whether one fact (here, [age]) caused another (here, [termination or failure to hire])[.]" *Ortiz*, 834 F.3d at 763; *see also Loyd v. Philips Bros., Inc.*, 25 F.3d 518, 522 (7th Cir. 1994) ("The expression 'prima facie case' in Title VII litigation popularly refers to a common, but not exclusive, method of establishing a triable issue of intentional discrimination."). However, the ultimate question remains the same: whether a rational trier of fact could find that Marnocha's age caused Defendants to terminate and/or fail to hire her. *See Ortiz*, 834 F.3d at 764.

### A. Termination

Marnocha alleges that St. Vincent improperly terminated her employment in violation of the Age Discrimination in Employment Act ("ADEA"). "The ADEA protects

workers 40 years of age and older from age-based discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018.) To recover under the ADEA Marnocha cannot merely show that age was a motivating factor, "but must prove that, but for [her] age, the adverse action would not have occurred." *Id.* (citations omitted).

The singular question for the Court is whether the evidence presented by Marnocha would permit a reasonable factfinder to conclude that her age, 62, caused Defendants to terminate her position. *See McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 367 (7th Cir. 2019). The Court begins its analysis using the *McDonnell Douglas* burden-shifting framework, then assesses the evidence as a whole.

To prove a prima facie case of discrimination, Marnocha must establish: (1) she was in the protected age class; (2) she was meeting St. Vincent's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Carson v. Lake Cty, Ind.*, 865 F.3d 526, 533 (7th Cir. 2017). If Marnocha can make out a prima facie case, 'the burden shifts to the defendant[s] to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to [Marnocha] to submit evidence that the employer's explanation is pretextual." *Id.*

Defendants concede, for purposes of summary judgment, that Marnocha was over 40 years old at the time of her termination, that she was meeting St. Vincent's legitimate expectations and that she was terminated. Defendants dispute the fourth ele-

ment, that similarly situated employees under the age of 40 were treated more favorably. Defendants argue that all similarly situated employees, the four other Carmel neonatologists, were treated the same—they were terminated during the restructure. Marnocha suggests that the 86th Street doctors should also be considered similarly situated to her, and that she had more experience than "a number of younger neonatologists at [86th Street]" and therefore they were treated more favorably. (Pl. Br., ECF No. 50 at 25.)

While similarly situated employees "need not be identical in every conceivable way," they "must be directly comparable to the plaintiff in all material respects." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (quoting *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009)) (internal quotations omitted). In other words, "there must be 'enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.'" *Skiba v. Illinois Cent. R. Co.* 884, F.3d 708, 723 (7th Cir. 2018) (quoting *Coleman*, 667 F.3d at 846). Plaintiffs must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *McDaniel*, 940 F.3d at 369.

Whether a comparator is similarly situated is "usually a question for the factfinder," and summary judgment is appropriate only when "no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Srail v. Vill. of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). Because Marnocha has not identified any similarly

situated employees at 86th Street to allow a juror to conduct a "meaningful comparison," her prima facie case for discriminatory termination must fail.  *See McDaniel*, 940 at 369.

In support of her similarly situated argument, Marnocha cites to her deposition testimony, in which she states: "I have way more experience at doing things than a number of younger neonatologists at [86th Street]" (Marnocha Dep. 122:14-18, ECF No. 47-6); the Restructure of Operations document, which names the 86th Street neonatologists who were retained (ECF No. 51-7); and Harris' deposition, in which she confirms that there were sixteen neonatologists and hospitalists working at 86th Street at the time of the restructure who had been working there for less than five years  (Harris Dep. 95:5-12, ECF No. 95).  However, she does not present evidence that she had the same supervisor or that the same standards or qualifications applied as between her, at a Level III unit, and the employees at the Level IV 86th Street unit.  Rather, she merely lists the names and ages of the 86th Street employees.

Two recent Seventh Circuit cases are particularly instructive here.  In *Skiba*, the court held that evidence listing the names, ages, and positions of thirty-seven employees did not amount to enough "amplifying detail of the employees' qualifications or employment history that would allow this Court to comfortably conclude their hiring was the result of discriminatory motive rather than some other explanatory variable."  884 F.3d at 723.  Similarly, in *McDaniel*, the plaintiff alleged that eight other employees were similarly situated to him, but did not provide their names, work his-

tory, performance reviews, or ages. 940 F.3d at 369. The plaintiff's "conclusory assertion that there is evidence that he was treated less favorably than similarly situated employees . . . was insufficient to raise an issue of fact and survive summary judgment." *Id.*

Marnocha's comparator evidence similarly fails to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Coleman*, 667 F.3d at 846 (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)). She does not provide the ages, work history, performance reviews, supervisors, or qualifications of the doctors at 86th Street, leaving the Court to speculate as to whether age or some other legitimate consideration caused the 86th Street neontologists to retain their positions. Therefore, Marnocha has failed to make out a prima facie case of discriminatory termination.

Although the *McDonell Douglas* framework is just one means through which Marnocha can prove her claim, looking cumulatively at all the evidence, the Court finds that no reasonable factfinder could conclude that Marnocha's age, 62, caused Defendants to terminate her position. *See Ortiz*, 834 F.3d at 765.

First, Marnocha asserts that Marandi invented his claim that the 86th Street NICU was overstaffed in order to justify terminating the older doctors at the Carmel NICU. In support, Marnocha cites to the deposition testimony of Yeo, Whitman, Leedy, and Ben Saad, in which they disagree with Marandi's determination that the 86th Street neonatologists were not working a full shift. But the issue before the

Court is not whether Marandi's decision was correct or wise, but whether he honestly believed that St. Vincent had too many doctors. *See Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017) (quoting *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)) (Pretext "involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.") Marnocha has failed to offer evidence sufficient to support an inference that Marandi did not honestly believe that 86th Street was overstaffed.

Marandi testified that he made the decision to restructure the NICUs on his own. Thus, it is immaterial whether he met with this group before coming to a decision. And Marandi's apparent disagreement with the group on whether 86th Street was overstaffed does not prove he had a discriminatory animus. He was the sole decisionmaker and therefore was not bound by the opinions of the other doctors. As the Seventh Circuit has long held, the court "is not a super personnel department that second-guesses employers' business judgments." *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 570 (7th Cir. 2017) (quoting *Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 895 (7th Cir. 2016)) (quotation marks omitted).

In further support of her claim that Marandi invented the overstaffing issue, Marnocha cites to Leedy's testimony in which she states that it was a "matter of opinion" as to whether the doctors at 86th Street were meeting their FTE, because administration had decided that hours that previously counted towards their FTE no longer did. Marnocha claims that Marandi was the one who changed the FTE requirements, but

this assertion is not supported by the record. Leedy's deposition testimony states that "leadership" felt certain hours no longer counted, and there is no evidence that Marandi, the sole decisionmaker of the restructure, decided to change the FTE requirements.

Next, Marnocha argues that Harris used "manipulated statistics" to create the Restructure of Operations document in an effort to cover up Marandi's discriminatory animus. Marnocha claims that the statistics were manipulated because Harris included the 86th Street doctors in the "target group" even though they were never considered for termination. However, Harris explained that when management comes to HR with a restructuring plan, it is their job to look at everyone with the same responsibilities in the departments that are involved. Further, even if Harris did intentionally manipulate statistics in order to hide age discrimination, Marandi himself testified that he was the sole decisionmaker. And there is no evidence in the record that Marandi requested Harris to compile the Restructure of Operations document, rather, it was a standard analysis that HR prepares every time there is a corporate restructure.

Marnocha also points to Marandi's lack of knowledge of the Carmel neonatologists' Level IV experience as evidence of pretext. Marandi testified that he did not know the Carmel doctors Level IV experience, but Harris testified that she and Marandi discussed it during their October 2017 meeting. Because of this inconsistency, Marnocha maintains that either: (1) "Defendant[s'] argument that Marnocha was unable

to work at the 86th Street NICU is an after-the-fact, fabricated argument not supported by the testimony of the person who made the decision," or (2) Marandi lied in his deposition when he testified that he did not know Marnocha's Level IV experience.

As for the first argument, Marandi testified that he did not know what Marnocha's Level IV experience was, and that the decision to terminate the Carmel neonatologists was because they would not necessarily be able to properly care for the babies at the Level IV NICU. Thus, Defendants' argument, that Marnocha could not work at 86th Street, is consistent with Marandi's testimony—he did not review the Carmel doctors' experience, but assumed that because they worked in a Level III NICU, they did not have the necessary skills or experience to make the transition.

As for Marnocha's second argument—that Marandi lied in his deposition testimony—whether he was mistaken or being dishonest about not knowing Marnocha's Level IV experience is not a disputed issue of material fact. All the Carmel neonatologists were terminated because Marandi wanted to consolidate the Carmel and 86th Street NICUs, and he assumed that the Level IV doctors would be better suited to cover a Level III and a Level IV NICU, rather than the other way around. Marandi's knowledge or lack thereof of the Carmel doctors' Level IV experience is not material and is not evidence of any discriminatory animus.

Marnocha next argues that St. Vincent's hiring of two younger neonatologists is evidence of pretext. Marnocha claims that these two doctors, White and Montgomery, were hired after the restructure took place. The record makes clear, however, that White was hired on April 17, 2017, two months before Marandi started analyzing the

operations of the NICUs, and Montgomery signed a contract with the 86th Street NICU in 2016. Also, although White began working at 86th Street on August 28, 2017, after restructuring discussions began taking place, and Montgomery began on August 13, 2018, after the restructure went into effect, these doctors did not replace Marnocha's position. Her position, along with the positions of the other neonatologists at Carmel, was terminated.

White replaced a departing neonatologist and then was one of the doctors chosen to be retained at 86th Street when the restructure went into effect. And Montgomery had already signed a contract during her tenure as a pediatric residence at the 86th Street NICU, which implies that she had proven capable of working in a Level IV NICU. Further, after the restructure, the Carmel and 86th Street NICUs still had a net less number of neonatologists. The fact that White and Montgomery were hired by the 86th Street NICU and retained during the restructure does not support Marnocha's claim that they were brought on to replace the terminated and older Carmel doctors.

Lastly, Marnocha claims that Marandi's testimony is unworthy of credence and that a jury must be empaneled to assess his credibility. The testimony that Marnocha cites to, however, does not create material issues of fact, nor does it raise an inference of discriminatory animus. For example, Marnocha first points to Marandi's testimony in which he denies meeting with the small group of 86th Street doctors in August 2017 to discuss the restructure. But as the Court noted above, Marandi was the sole decisionmaker for the corporate restructure, so it is immaterial whether he met

with this group before coming to a decision. Marnocha also argues that Marandi is not credible because he testified that he did not know why Harris included all of the hospitalists and neonatologists in her HR Restructure of Operations Guideline. Again, as the Court explained above, Marandi was not involved with creating this document. Harris testified that it was standard HR procedure to compile the document whenever there was a corporate restructure, and that they had to consider all affected departments in their analysis, regardless of what administration's plan was.

Marnocha has failed to prove that Defendants' rationale for terminating her was pretext for age discrimination, and therefore summary judgment on Marnocha's failure to hire claim is proper. No reasonable trier of fact could find that Marnocha was terminated based on her age.

### B. Failure to Hire

Tunstall also alleges that she was discriminated against because St. Vincent failed to hire her. Under the *McDonnell Douglas* framework, a plaintiff establishes a prima facie case of discriminatory failure to hire by showing that (1) she is a member of a protected class; (2) she applied for and was qualified for an open position; (3) despite her qualifications, she was rejected for the position; and (4) a similarly situated person outside her protected class was hired for the position. *See Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018). The Court assumes, *arguendo*, that Marnocha has established these elements and focuses on Defendants' rationale for not hiring her. *See id.* (assuming the plaintiff met the initial burden and focusing

on the employer's rationale and pretext); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012) (same).

In evaluating whether an employer's rationale is pretextual, "the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Skiba*, 884 F.3d at 724 (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). "[I]t is not 'the court's concern that an employer may be wrong about its employee's performance . . . . Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" *Id.*

Defendants insist that Landis was selected for the position over Marnocha because she was more qualified. Marnocha argues that this rationale is pretext for age discrimination. In support, she cites to the following evidence: (1) Rothenberg's notes that Marnocha was "at the end of her career"; (2) Marnocha's qualifications; (3) Harris and Marandi's preference for Landis; and (4) St. Vincent's hiring of Dr. White (37) and Dr. Montgomery (36). The Court addresses each in turn.

i.   <u>Rothenberg's Notes</u>

Marnocha first argues that because Rothenberg considered Marnocha to be at the end of her career, and because he was the Medical Director at 86th Street and a "C-Suite Executive" he must have used his superiority to influence the other panel members to select Landis for the position. But all six panel members testified that their decision was unanimous and was based on Landis' recent Level IV experience at a top ranked NICU, her positive attitude, her plan on how to transition to 86th Street,

and her research on surgical protocols in Level IV NICUs. The panel also thought Marnocha was less qualified than Landis because Marnocha had not recently worked in a Level IV NICU and she did not believe she would need training to make the transition. Marnocha offers no evidence that Rothenberg's thoughts about planning for "20, 30 years into the future" were ever shared with the group, nor does she offer any evidence that Rothenberg had any influence over the panel's decision. No reasonable juror could find, based on Rothenberg's notes and deposition testimony, that the panel did not select Marnocha because of her age.

ii. <u>Marnocha's Qualifications</u>

Marnocha next argues that she was "significantly" more qualified for the position than Landis. Marnocha had thirty years of experience as a neonatologist, sixteen of which were spent at the 86th Street NICU. Landis, on the other hand, had only three years' experience as a neonatologist, all of which were at the Carmel NICU. However, the panelists all thought that Landis' recent experience as a fellow at a top ranked Level IV NICU was a more pertinent qualification for the position because they believed medicine was constantly changing and that Level IV NICU care was certainly different now than it was fifteen years ago, when Marnocha worked at 86th Street.

Whether or not the panel was correct in favoring recent experience over total number of years of experience in Level IV care, that is a business judgment that this Court cannot second guess. *See Grant v. Trustees of Indiana University,* 870 F.3d 562, 570 (7th Cir, 2017). A court's "role is to prevent unlawful hiring practices, not to act as a super personnel department that second-guesses employers' business judgments."

*Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (internal citations omitted). And Marnocha has not presented any evidence calling into question the sincerity of the panel's belief that recent Level IV experience is more valuable than total number of years of experience. *See Gordon v. United Airlines, Inc.,* 246 F.3d 878, 889 (7th Cir. 2001) ("[W]hen the sincerity of an employer's asserted reasons for discharging an employee is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation.")

iii.    Preference for Landis

Marnocha also claims that Rothenberg and Harris had a preference for hiring Landis, based on their October 2017 discussion of moving Landis to 86th Street rather than terminating her and re-hiring her. However, neither Harris nor Rothenberg was a part of the six-member panel that chose Landis for the position. While this may be probative of a discriminatory motive in Rothenberg's decision to terminate the Carmel doctors, Rothenberg was not on the panel that unanimously chose Landis, and Marnocha has not presented any evidence that he had an influence on the panel's decision.

iv.    St. Vincent's hiring of Dr. White and Dr. Montgomery

Lastly, Marnocha points to the hiring of two younger neonatologists as evidence that Defendants' failed to hire her because of her age. But White and Montgomery were both hired before Marnocha was turned down for the position, and before Maranadi began analyzing the operations of the 86th Street and Carmel NICUs. White was hired on at 86th Street on April 17, 2017, two months before Marandi began

analyzing the operations of the 86th Street and Carmel NICUs. And Montgomery signed a contract with 86th Street in 2016 when she was a pediatric resident.

Because Marnocha has failed to prove that Defendants' rationale for not hiring her was pretext for age discrimination, summary judgment on Marnocha's failure to hire claim is proper. No reasonable trier of fact could find that Marnocha was not hired based on her age.

## IV.    Conclusion

For the reasons stated above, Defendants' motion for summary judgment (ECF No. 45) is **granted**. Further, Defendants' Motion to Strike Surreply is **denied**. Marnocha's claims are dismissed on the merits with **prejudice**. A final judgment will be entered separately.

**SO ORDERED.**

Date:   2/7/2020

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution to all parties of record via CM/ECF.